IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

IFAST, LTD.                                          :
                                                     :
             v.                                      :
                                                     :   CIVIL NO. CCB-06-2088
ALLIANCE FOR TELECOMMUNICATIONS :
INDUSTRY SOLUTIONS, INC.                             :
                                        ...o0o...

## MEMORANDUM

This case marks the second attempt by the International Forum on ANSI-41 Standards

Technology ("IFAST")[1] to sue the Alliance for Telecommunications Industry Solutions, Inc.

("ATIS") for allegedly tortious conduct during and after the period of IFAST's affiliation with

ATIS ("second or current IFAST suit").  The amended complaint brings claims for breach of

fiduciary duty (count I), conversion (count II), unjust enrichment (count III), replevin (count IV),

and accounting (count V).  ATIS has filed a motion to dismiss due to IFAST, LTD's lack of

standing (Fed. R. Civ. P. 12(b)(1)) or alternatively for failure to state a claim (Rule 12(b)(6)).

The motion has been fully briefed, and a hearing was held in this case and the related suit of

*Alliance for Telecommunications Industry Solutions*, *Inc. v. Hall*, *et al.*, CCB-05-440 ("ATIS

suit"), on June 25, 2007.  For reasons that will be discussed further below, ATIS's motion to

dismiss will be granted because IFAST, LTD. lacks standing to pursue this suit and, even if it

had standing, it has failed to state claims for which relief could be granted.

---

[1]        Not distinguishing here between the IFAST forum and IFAST, LTD. is a
purposeful choice.  Any subsequent references also not drawing this distinction
are meant to refer to whichever entity was carrying out the central functions that
IFAST has maintained throughout its existence at a given point in time.

1

# BACKGROUND

Most of the relevant factual background is set out in the opinion released concurrently in the ATIS suit,[2] however, some additional information about the attempt to render IFAST, LTD. ("the corporation") the successor in interest to the IFAST forum ("the forum") is necessary.

The corporation's initial suit against ATIS and Susan Miller (CCB-05-1448) ("first IFAST suit") for alleged torts arising out of the forum's affiliation with ATIS was dismissed on jurisdictional grounds.  The court held the corporation was "not a legitimate successor in interest to the IFAST forum, so IFAST, LTD. lacks standing to bring claims on behalf of the association."  *IFAST, LTD. v. ATIS, Inc. & Susan Miller*, No. CCB-05-1448, at *2 (D. Md. Mar. 28, 2006) (unpublished).  The attempt to incorporate the IFAST forum as IFAST, LTD. was invalid because it was done unilaterally, without the consent of the forum's membership.  *See id.* (explaining that "[b]ecause neither IFAST's governing documents nor any Maryland statute allowed for incorporation without the full consent of the membership, unanimous consent was required").  Although this opinion refers to the forum as an unincorporated association, it does so against the backdrop of the parties' agreement on this point for the purposes of that motion.  At that time, ATIS did not contest the issue (although it now does), and IFAST relied on it, grounding its opposition to ATIS's motion to dismiss in "the findings in this court's decision denying ATIS's motion for a preliminary injunction [in the ATIS suit], wherein the court found that IFAST was an independent organization before, during, and after its secretariat relationship

---

[2]     By thus referring to its opinion in the related ATIS suit, the court is not implying all factual determinations contained therein are binding on the current IFAST suit. The court's analysis in this current suit is based only on those facts presented in IFAST, LTD.'s amended complaint and those to which the parties agreed in their briefing or during the motions hearing.

with ATIS." *Id.* at *6.   The forum's legal status thus has never been definitively established; the court will resolve the issue in this opinion.

In response to the court's disposition of the first IFAST suit, the central players within IFAST took steps to make any causes of action belonging to the forum legitimately became those of the corporation.   The people identified as the forum's management team– Bernardo Martinez, Edward Hall, Syed Hosain, David Crowe, and Art Prest– who all appear to be on the corporation's board of directors as well ("managers/directors")[3] adopted articles of association and by-laws on June 30, 2006 (well after the incorporation of IFAST, LTD. on February 17, 2005).   (Letter from Attorney Reingold (Aug. 18, 2006) [hereinafter "Reingold Letter"] at 5, n.4.) The articles and by-laws were then sent to all those identified as members in good standing of the forum; good standing was defined in the by-laws as those current on their IRM-fee payments.   They were consented to by 34 members, 79% of those choosing to remain members (some had opted out of the forum's governance structure, preferring to remain as IRM customers only).   As this was more than the simple majority required by the by-laws for their ratification, the management team deemed the by-laws accepted.   (*Id.* at 2.)

---

[3]       As discussed at the June 25th motions hearing, of these five men, four were also on the forum's management team during the period in late fall and early winter 2004 through early 2005 in which Mr. Hall left ATIS, the IFAST forum broke off its relationship with ATIS to enter into an arrangement with TXI, and IFAST, LTD. was incorporated.   These four are Messrs. Martinez, Hosain, Crowe, and Hall, and they also served on the corporation's initial board of directors.   ATIS states– and the corporation does not contest– that these four men and Mr. Prest are all currently on IFAST, LTD.'s board of directors.   There was an additional member of the management team in late 2004 and early 2005, David Grootwassink, who was not on the management team at the time the articles and by-laws were adopted.

When the management team disseminated the articles and by-laws to the members for their approval, it also asked them to consent to three other actions: (1) transferring all the forum's assets to the corporation; (2) converting their membership interest in the forum to a membership interest in the corporation;[4] and (3) dissolving the forum.  (*Id.* at 3.)  All members approving the by-laws gave their consent to these actions as well.  (*Id.*)  The by-laws also permitted the management team to authorize the asset transfer and dissolution without a membership vote, but a forum-wide meeting for this purpose was called nonetheless.  At this meeting, in which the management team and one member participated, it was decided to transfer the forum's assets to the corporation and dissolve the forum.  (*Id.* at 3-4.)  Forum members were asked to notify the corporation if they wanted to become members of the corporation; because there had not been unanimity among the members, membership in the forum did not automatically become membership in the corporation.  (*Id.* at 4.)

In early August 2006, the second IFAST suit was filed.  The corporation sought to consolidate this suit with the ATIS suit in order to take advantage of the upcoming September 11, 2006 trial date, but the court refused to order consolidation so close to trial.  Following trial, during which it became clear that no formal contract had existed between the forum and ATIS, the corporation amended its complaint to state non-contract causes of action.

## ANALYSIS

*Legal Standards*

At the outset, the potential impact of the Supreme Court's recent decision in *Bell Atlantic*

---

[4]     IFAST, LTD. is a non-stock corporation, thus it is appropriate to speak of members rather than stockholders.  (Reingold Letter at 3, n.3.)

*Corp. v. Twombly*, 127 S. Ct. 1955 (2007), should be addressed.  The defendant argues it changes the legal framework for the court's consideration of its 12(b)(6) motion; the plaintiff contends that it is not applicable to this case, but in the event it is, that the complaint still survives dismissal.  *Twombly* is an antitrust case where the plaintiffs' theory of the case was based on alleged "parallel conduct" by the defendants and the inference that an illegal agreement existed among them.  *Id.* at 1962-63.  The defendants moved to dismiss the case for failure to state a claim, and the Court agreed with the district court's decision to grant the motion.  *Id.* at 1963.  In reaching this conclusion, the Court rejected a passage from *Conley v. Gibson*, 355 U.S. 41 (1957) that has long been a mainstay of lower courts' treatment of 12(b)(6) motions: "'the accepted rule [is] that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Twombly*, 127 S. Ct. at 1968 (quoting *Conley*, 355 U.S. at 45-46).  The Court expressed its concern that "a focused and literal" reading of this passage (which the Court of Appeals employed in the instant case) could result in "a wholly conclusory statement of [a] claim" surviving a 12(b)(6) motion "whenever the pleadings left open the possibility" that a plaintiff might at some point arrive at some set of facts in support of his or her claim.  *Id.* at 1968.  While acknowledging that many judges have not construed this passage in this "focused and literal" manner, the Court nonetheless concluded that *Conley*'s

> famous observation has earned its retirement.  The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.

*Id.* at 1969 (internal citation omitted).  In place of this approach, the Court looked to see whether the complaint contained "enough facts to state a claim to relief that is plausible on its face," and

it held that in the case before it, "the plaintiffs here have not nudged their claims across the line from conceivable to plausible," thus dismissal was required. *Id.* at 1974.

It remains unresolved whether *Twombly* applies only to antitrust cases, or to "certain subjects understood to raise a high risk of abusive litigation," *id.* at 1973 n.14, or to all civil litigation. *See id.* at 1988 (leaving as a "question that the future will answer" whether *Twombly* "will benefit only defendants in antitrust treble-damages cases, or whether its test for the sufficiency of a complaint will inure to the benefit of all civil defendants") (Stevens, J., dissenting). Because the use of *Twombly* has been specifically raised by ATIS, and because this motion will be granted regardless of the precise formulation of the 12(b)(6) standard, the court will incorporate language from *Twombly* into its legal analysis. This should not be construed as any comment by the court, however, on whether *Twombly* generally applies to all civil litigation.

"The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint; importantly, a Rule 12(b)(6) motion does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (internal quotation marks and alterations omitted). When ruling on such a motion, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). To survive a motion to dismiss, a complaint must "in light of the nature of the action . . . sufficiently allege each element of the cause of action so as to inform the opposing party of the claim and its general basis." *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 348 (4th Cir. 2005). A motion to dismiss under Rule 12(b)(6) should be granted when the facts pled have not "nudged [a plaintiff's] claim[] across the line from

conceivable to plausible," however, "a well-pleaded complaint may proceed even if it strikes a

savvy judge that actual proof of those facts [pled] is improbable, and 'that a recovery is very

remote and unlikely.'" *Twombly*, 127 S. Ct. at 1965-66, 1974 (internal references omitted).  In

addition, because the court is testing the legal sufficiency of the claims, the court is not bound by

the plaintiff's legal conclusions.  *See*, *e.g.*, *Young v. City of Mount Ranier*, 238 F.3d 567, 577

(4th Cir. 2001) (noting that the "presence . . . of a few conclusory legal terms does not insulate a

complaint from dismissal under Rule 12(b)(6)" when the facts alleged do not support the legal

conclusions).

Turning now to the 12(b)(1) standard, federal courts are obligated "'to examine their own

jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'"

*United States v. Hays,* 515 U.S. 737, 742 (1995) (internal citations omitted).  Because standing is

a core element of federal subject matter jurisdiction, it is subject to the same standard of review

that applies to a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P.

12(b)(1).  *Falwell v. City of Lynchburg, Virginia*, 198 F. Supp.2d 765, 771 (W.D. Va. 2002).

When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff

has the burden of proving subject matter jurisdiction.  *Evans v. B.F. Perkins Co.*, 166 F.3d 642,

647 (4th Cir. 1999) (citing *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945

F.2d 765, 768 (4th Cir. 1991)).  In considering a motion to dismiss for lack of standing, the court

must accept as true all material factual allegations in the complaint and must construe the

complaint in favor of the plaintiff.  *Warth v. Seldin*, 422 U.S. 490, 501 (1975).  The court is to

regard the pleadings as "mere evidence on the issue, and may consider evidence outside the

pleadings without converting the proceeding to one for summary judgment."  *Richmond*,

*Fredericksburg & Potomac R.R.*, 945 F.2d at 768 (internal citations omitted).  The district court

should grant the 12(b)(1) motion "only if the material jurisdictional facts are not in dispute and

the moving party is entitled to prevail as a matter of law."  *Id.* (internal citations omitted).

  *IFAST, LTD.'s Standing*[5]

  The corporation has standing to bring these claims only if they were legitimately

acquired from the forum.  In order to answer this question, it first must be established whether

the forum was ever an unincorporated association.  An unincorporated association is "generally

defined as 'a body of persons acting together and using certain methods for prosecuting a special

purpose or common enterprise' 'The common purpose or interest affords a court objective

criteria by which it may ascertain the membership.'"  *Project Basic Tenants Union v. Rhode*

*Island Hous. & Mortgage Fin. Corp.*, 636 F. Supp. 1453, 1458 (D.R.I. 1986) (internal citations

omitted).  An unincorporated association must consist of an "actual assemblage[] of people"; an

"'amorphous and attenuated' group[] or 'the most informal or transitory of organizations'" do

not constitute an unincorporated association.  *Id.* (internal citations omitted).

  Several factors seem key to determining whether an organization has a common purpose

or interest such that it constitutes an unincorporated association.  These include whether it has

assets, leases property, and conducts organizational activities.  *See Save-A-Patriot Fellowship v.*

*United States*, 962 F. Supp. 695, 697 (D. Md. 1996).  The existence of a defined membership is

also important, *see id.*, although the composition of this membership does not have to be static.

*See Project Basic Tenants Union*, 636 F. Supp. at 1458 (finding that an unincorporated

---

   [5]  Neither party contends that the factual and legal issues and outcomes involved in
the first IFAST suit are not binding upon the current suit.  Thus, they will be
referred to for the purposes of deciding the 12(b)(1) motion when necessary.

association existed even where membership consisted of "any one [sic] willing to meet and work toward the Union's goal" because this created "an actual assemblage of people").

Other factors may also have bearing on this determination, but an unincorporated association may exist even in their absence.  For instance, having a structure, elected officers, budget, and by-laws would support the existence of an organization designed to further a common purpose or interest, but their lack does not mean no unincorporated association exists.  *See id.* at 1458.  The same is true of financial records.  *See Save-A-Patriot Fellowship*, 962 F. Supp. at 697.  The lack of formalities required may be seen in the recognition as unincorporated associations of groups in which the rejection of fundamental underpinnings of mainstream society was central to their common purpose or interest and activities.  *See id.* at 699 (recognizing a group dedicated to tax avoidance as an unincorporated association); *see also Motta v. Samuel Weiser, Inc.*, 768 F.2d 481, 483 (1st Cir. 1985) (recognizing a cult as an unincorporated association).  If people coming together in an unorthodox manner to further an unorthodox purpose can constitute an unincorporated association, the minimum requirements to give rise to an unincorporated association can hardly be understood as stringent.

In Maryland,[6] an unincorporated association "may sue or be sued in the group name on any cause of action affecting the common property, rights, and liabilities of the group."  Md. Code Ann. Cts. & Jud. Proc. § 6-406(a) (2006).  Any judgment that results "is enforceable only against the assets of the group as an entity, but not against the assets of any member."  Md. Code

---

[6]     The parties have been proceeding as if Maryland law applies.  ATIS reserved the ability to argue otherwise (Reply Mem. at 2 n.2), however, as no arguments were advanced in briefing or oral argument that another state's law applies, the court will apply Maryland law to this case, as it has done in the first IFAST suit and in the related ATIS suit.

Cts. & Jud. Proc. § 11-105 (2006).  These provisions have been interpreted by the courts to mean that an unincorporated association in Maryland "can own property in its own right."  *See Save-A-Patriot Fellowship*, 962 F. Supp. at 699.  Thus if the forum was an unincorporated association that had causes of action against ATIS that were legitimately conveyed to the corporation, the corporation has standing to pursue the current suit.

It seems clear the forum was an unincorporated association, at least prior to its affiliation with ATIS.  It had members[7] who came together to work on issues arising from the use of international roaming services by subscribers to ANSI-41-based wireless networks, a clear common purpose or interest.  Among other duties, the forum assigned and maintained International Roaming Mobile Identification Numbers ("IRMs")[8] and System Identification Numbers ("SIDs"), activities undertaken in furtherance of this common goal.  It also convened numerous meetings around the world to address technical issues of concern to the ANSI-41 community, as well as formed project teams when specific issues called for further work.  The forum relied upon other organizations, which they considered secretariats, to provide them with administrative and other support services.  Although there were no by-laws or formal governance structure, there was a chairman and a management team that oversaw the forum's activities.   It appears as if the forum owned common property, such as the right to assign IRM codes.  Even if each central factor was not equally present, taken together they establish the forum had a

---

[7]     The forum's members were both individuals and corporations.

[8]     IRMs are wireless telephone codes assigned to domestic cellular telephones so that individuals traveling internationally will not experience conflicts with telephone numbering systems in foreign countries.  Without IRMs, wireless ANSI-41-based networks could not offer international roaming services.

membership that acted together to provide for the smooth and efficient use of international roaming services by subscribers to ANSI-41-based wireless networks, thereby satisfying the essential requirements of being an unincorporated association.

ATIS has not made a convincing argument that the forum's affiliation with it rendered the forum part of ATIS and dissolved the forum as an unincorporated association.  As the court discussed in its dismissal of the first IFAST suit, unanimous consent is required to transform an unincorporated association into a corporation (at least absent provision to the contrary in applicable statutes or the association's own by laws).  This reflects a more general principle: namely, that an unincorporated association cannot dissolve, through incorporation or otherwise, without consent of the membership (providing that no statute or organizational by-laws establish otherwise).  *See* 6  Am. Jur. 2d Associations and Clubs § 61 (2007) (explaining that "where no provision is made in the constitution or bylaws of an unincorporated association as to the method of dissolution, the association may only be dissolved by the unanimous consent of its members.").  Since somehow becoming part of ATIS would have dissolved the forum's independent legal existence, such a step would have required consent of the forum's entire membership, which ATIS has not even alleged was obtained.  There is thus no basis for concluding the forum dissolved upon entering into a relationship with ATIS.

This does not mean that the forum– which was capable of owning property and transacting business under its own name– did not enter into ventures with ATIS out of which common property or mutual obligations arose.  There does not seem to be any legal principle under which an unincorporated association cannot take steps to further its interests absent the consent of the entire membership.  *See* 7 C.J.S. Associations §§ 28, 30 (2007) (stating that "[a]n

officer of a voluntary, unincorporated association who has not been formally elected may nevertheless act on behalf of the association where there has been an implied grant of authority to so act, in light of evidence they were deemed by members of the association to be its officers and agents" and such an officer "may bind [the association] when acting within [his] powers"). The forum's management team could enter into arrangements with ATIS that would bind the forum to certain obligations or create certain property interests;[9] what it could not do was transform the forum into part of ATIS and dissolve the forum's separate identity.

Having thus established that the forum remained an unincorporated association during its connection with ATIS, the next question is what happened to the forum when the corporation was formed on February 17, 2005.  While it is clear the forum did not become the corporation, this alone does not establish its continued existence.[10]  The corporation was formed with the express purpose of carrying out all those functions the forum had provided, such as assigning IRM codes and collecting IRM fees.  It is not clear what, if anything, the members of the forum continued to do in pursuit of the forum's common purpose and interests, nevertheless the forum likely still had a legal identity, even if it may have disappeared for all practical purposes.  The unilateral action of the managers/directors in forming IFAST, LTD. could no more dissolve the forum into nothingness than it could dissolve it through incorporation, in light of the general rule that unanimous consent is required to dissolve an unincorporated association.  *See* 6 Am. Jur. 2d Associations and Clubs § 61 (2007).

---

[9]     The obligations and property rights of ATIS and the IFAST forum are discussed in detail in the opinion in the ATIS suit.

[10]     The court's opinion dismissing the first IFAST suit specifically reserved this question.  *IFAST, LTD.*, No. CCB-05-1448 at *6, n.2.

Establishing that the forum continued to have a legal existence following the formation of

IFAST, LTD. does not mean the managers/directors remained members of it and had the power

to initiate adoption of the articles of incorporation and by-laws.[11]   ATIS argues that by virtue of

forming the corporation and proclaiming that corporation the forum's successor, the

managers/directors forfeited any stake in the forum.   There is authority for the proposition that,

absent provision to the contrary in applicable by laws,

> members who withdraw [from an unincorporated association] thereby lose their rights to
> associate property, title to which stays in the members remaining in the association,[12] and
> the rule applies whether membership is terminated by the member's own act or omission
> or by the act of the society.   This rule applies even where a number of members secede in
> a body, and although they constitute a majority, and organize a new association.   In such
> case the remaining members, and only they, are entitled to the entire funds and property
> of the association, so long as they continue to keep it alive and adhere to its purposes.

*DeBruyn v. Golden Age Club of Cheyenne*, 399 P.2d 390, 392-93 (Wyo. 1965) (quoting 7 C.J.S.

Associations § 27b, p. 70) (internal quotation marks omitted).   In *DeBruyn*, the trial court

applied this general rule where the original association continued to advance its interests and

activities despite the withdrawal of a group of members who formed a corporation for essentially

the same purpose.   *Id.* at 393.[13]   It is not clear the managers/directors affirmatively stated they

were leaving the forum, but their withdrawal may be seen as implicit in their attempt to

---

[11]   During the motions hearing, counsel for ATIS also raised legitimate questions
about whether the managers/directors represented all those who should have been
included as part of the forum's management team when the adoption decision was
made.

[12]   Maryland law, in contrast, recognizes that an unincorporated association itself
may hold property.   *See Save-A-Patriot Fellowship*, 962 F. Supp. at 699.

[13]   The situation of the forum and IFAST, LTD. is somewhat distinguishable because
it is not clear the forum continued to serve any purpose after the corporation was
formed.   This distinction likely has no relevance, however, because the salient
issue is whether the managers/directors withdrew.

incorporate.  The act of incorporating IFAST, LTD. to carry out the same purpose and activities

as the forum is a rejection of the forum's existence as an unincorporated association.  As it is

impossible to be a member of something that does not exist, the managers/directors effectively

declared their withdrawal from the forum when they attempted to transform it into a

corporation.[14]

Even if the managers/directors somehow remained part of the forum, it is unlikely their

attempt to adopt the articles of association and bylaws was successful.  As part of this process,

forum membership was defined as those current with their IRM-fee payments (Reingold Letter at

2 n.2), however, this definition was only set forth in the by laws, and not at any prior point.[15]

The by laws thus defined the group that could vote on them before any vote was taken, excluding

IRM and SID holders behind on their fees who nonetheless might have a claim to membership

based on other involvement.   This definition is also somewhat suspect because it favors those

who have interacted with the corporation to its satisfaction, since fee payments were presumably

collected by IFAST, LTD. following its formation.  It seems unlikely that the purported authority

to dissolve the forum and transfer its assets, which came from the by laws, was legitimate.  Thus,

the corporation has failed to meet its burden of proving it has standing to pursue this case.

---

[14]     It is possible the same analysis would not apply to Mr. Prest because  he was not a
member of the management team both at the time IFAST, LTD. was formed and
at the time the articles and by-laws were adopted.  Given that everyone else on the
management team was a member at both points in time, even if Mr. Prest was
somehow in a unique position, the action of the management team as a whole in
adopting the articles and by-laws is still likely invalid.

[15]     In response to the court's question during the motions hearing about whether
forum membership had ever been defined by fee payment previously, counsel for
the corporation said there had never been any formal votes taken in the past, thus
implying that no explicit membership criteria had previously existed.

No purported members of the forum have taken issue with this maneuvering, but because it goes to the issue of standing rather than internal governance, ATIS may properly make arguments about it.  This court also has an "'independent obligation'" to assess its own jurisdiction, and "'standing "is perhaps the most important of [these jurisdictional] doctrines."'" *See Hays*, 515 U.S. at 742 (internal citations omitted).  The corporation submits that even if the court may consider issues surrounding the attempted adoption of the articles and by laws, it should defer to the decisions of the managers/directors under the analogue to the business judgment rule that applies to unincorporated associations.  *See NAACP v. Golding*, 679 A.2d 554, 561, 342 Md. 663, 678 (Ct. App. 1996) (stating the Maryland rule "limiting courts' intervention in the internal disputes of unincorporated organizations absent fraud is in essence analogous to the business judgment rule applicable to incorporated organizations") (internal citation omitted).  This rule applies to judicial intervention in the "internal disputes" of an unincorporated association, *id.*; it does not serve to prevent the court from fulfilling its essential obligation to analyze its own jurisdiction, *see Hays*, 515 U.S. at 742, by assessing what repercussions actions taken by those at the helm of an unincorporated association might have had on the association's legal status.

As for the remaining issue of what legal status, if any, the forum still has, the answer is somewhat unclear.  Because the corporation has assumed the activities and property of the forum without any objection by potential forum members,[16] the forum has been dissolved for all practical purposes, but in light of the principle that unanimity is required for dissolution (absent provision otherwise, which likely does not exist here), the forum does not seem to have been

---

[16]        Unless, of course, ATIS is seen as a member.

15

dissolved *de jure*.  This should not be construed as an invitation for the managers/directors to seek again to establish the corporation as the forum's successor in interest; as discussed previously, it is unlikely they have remained members of the forum and have the power to effect such changes.

*Individual Claims*[17]

The first claim is that ATIS breached its fiduciary duty to the forum by failing to account for and keeping "funds it retained in excess of IFAST's annual operating expenses, and in failing to account for IRM fees ATIS has received since December 9, 2004 [the date the forum broke with ATIS and switched to TXI for support], from certain IRM holders."  (Am. Compl. ¶¶ 41-42.)   IFAST, LTD. contends that ATIS owed fiduciary duties to the forum because "the secretariat arrangement" established a principal (IFAST forum) agent (ATIS) relationship between ATIS and the forum.  (*Id.* at ¶ 38.)  An agency relationship arises through "'the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.'" *Green v. H & R Block, Inc.*, 735 A.2d 1039, 1047, 355 Md. 488, 503 (Ct. App. 1999) (quoting Restatement (Second) of Agency § 1 (1958)).  This mutual consent does not have to be expressly given; it can arise "by inference from the acts of the agent and principal."  *Id.* at 1047-48 (internal citations omitted).  The central question is thus one of "the parties' intentions as manifested by their agreements or actions." *Id.*

---

[17]     Although additional information from the related ATIS suit may be relevant, the following analysis addresses each claim only as it is pled, both in order to remain within the parameters of 12(b)(6) and due to unresolved issues surrounding the applicability of res judicata and collateral estoppel principles.  The only additional facts relied upon are those to which the parties have agreed, either in their briefing or during the motions hearing.

at 1047 (internal citations omitted).  Three factors have "particular relevance" in determining

whether an agency relationship exists: "(1) the agent's power to alter the legal relations of the

principal; (2) the agent's duty to act primarily for the benefit of the principal; and (3) the

principal's right to control the agent."  *Id.* at 1048 (internal references omitted).

IFAST, LTD.'s contention that an agency relationship existed between ATIS and the

forum amounts to a legal conclusion without any factual basis, which the court is not bound to

accept.  The facts pled depict ATIS as the forum's secretariat, that is, as the provider for the

forum's "administrative needs."  (Am. Compl. ¶ 12.)  ATIS essentially served as the forum's

office, providing it a phone number, a mailing address, and transmitting messages on its behalf,

however, "IFAST communicated with its members (and others) in its own name."  (*Id.*)  ATIS's

other functions were to "(a) maintain IFAST's records and documents, (b) arrange IFAST

meetings, (c) bill and collect IRM and annual maintenance fees on behalf of IFAST; and (d)

perform other duties deemed appropriate by IFAST."  (*Id.* at ¶ 18.)   There is a bald assertion that

"[f]or the purposes of billing and collecting the fees, ATIS was to serve as IFAST's agent," (*id.*

at ¶ 20), but no acts of ATIS's are offered to show it consented to an agency relationship, either

expressly or by inference.  Indeed, the facts pled suggest the forum itself viewed ATIS as a mere

service-provider that would be compensated appropriately (*id.* at ¶ 21) but was not authorized to

alter the forum's legal relations in any manner, had not agreed to act primarily for the forum's

benefit, and had not assented to the forum's control over the manner in which services were

provided.  No claim for breach of fiduciary duty has been adequately stated.

Turning now to the conversion and replevin claims (counts II and IV), the forum alleges

that ATIS has unlawfully retained two categories of funds: those received from IRM fees during

17

the forum's affiliation with ATIS in excess of the amount necessary to cover the forum's annual

operating expenses ("excess fees") and those IRM fees received since December 9, 2004 from

some IRM-holders ("post-departure fees").  "The general rule is that monies are intangible and,

therefore, not subject to a claim for conversion."  *Allied Inv. Corp. v. Jasen*, 731 A.2d 957, 966,

354 Md. 547, 564 (Ct. App. 1999) (internal references omitted).  An exception applies where

"the plaintiff seeks to recover specific segregated or identifiable funds."  *Darcars Motors of*

*Silver Spring*, *Inc. v. Borzym*, 841 A.2d 828, 834, n.3, 379 Md. 249, 259 (Ct. App. 2004)

(internal citations omitted).  It was established during trial in the ATIS suit that IRM fees were

deposited into ATIS's general account; that is, they were not segregated.  (Mot. Dismiss at 16,

n.15.)  The parties confirmed this fact during the motions hearing in the current IFAST suit.[18]

The corporation, however, relies upon *Allied Inv. Corp.* for the proposition that conversion

claims are also allowed when funds "'should have been segregated for a particular purpose,'"

731 A.2d at 966 (internal citation omitted), which it alleges they should have been here.

Even if IRM fees belonged to the forum and should have been segregated for its purposes

only, at least some of that money would have ultimately belonged to ATIS because the forum's

purposes included compensating ATIS for its services.  (*See* Am. Compl. ¶ 21) (stating that

"ATIS was to be compensated for its services by deducting [certain amounts] from revenues it

collected on behalf of IFAST"; all fees above this amount were to belong to IFAST).  According

to the amended complaint, ATIS was required to segregate IRM fees received, which were "not

---

[18]     At the motions hearing, the court inquired of ATIS's counsel whether all IRM
fees received at any point went into ATIS's general account.  ATIS's counsel
confirmed this was so, and counsel for the corporation said he knew of nothing to
contradict this assertion.

[to be] commingled with ATIS's general operating funds, and used only for IFAST's purposes."
(*Id.* at ¶ 20.)  Presumably, under this system, ATIS would have at some point deducted the
amount of its compensation from the segregated account, leaving the balance for the forum.
Thus even if ATIS had adhered to the system set forth in the amended complaint, it would have
resulted in the existence– at least at times– of commingled ATIS/forum funds, because "IFAST's
purposes" (*id.* at ¶ 20) included compensating ATIS (*id.* at ¶ 21).  *See Allied Inv. Corp.*, 731
A.2d at 566 (explaining that when "a defendant maintains possession of the proceeds in question,
but commingles it with other monies, the cash loses its specific identity" and citing cases for the
general proposition that conversion is not the proper vehicle for recovering funds deposited into
a general checking account).  Such commingled funds would not be the proper subject of a
conversion claim.

      This is true with respect both to the excess fees and to the post-departure fees.  The
excess fees arose during the course of the forum's affiliation with ATIS, when ATIS clearly was
entitled to a certain portion of IRM fees for its compensation.  It would be difficult if not
impossible to distinguish between the portions of specific payments made by IRM holders
comprising the amount due to ATIS, and those portions belonging to the forum.  Furthermore, in
bringing a conversion claim for the excess fees, the corporation is essentially saying that ATIS
kept more money for its services than the amount to which it was entitled.  This would give rise
to a debt ATIS presumably could satisfy with payment of a certain sum; ATIS would not have to
return the specific payments in the actual form made by IRM holders.  *See Darcars*, 841 A.2d at
834 n.3.

      With respect to the post-departure fees, the forum suggests ATIS was not entitled to any

of them because it was no longer providing services for the forum and thus not involved with

IRM code assignment in any fashion.  Even if the forum was in fact entitled to the full amount of

these fees, they nonetheless would have had to be processed by ATIS because IRM holders sent

them there (even if they did so in error).  As explained above, under the system the forum alleges

ATIS should have followed, all IRM fees collected would have gone into a segregated account

for IFAST's purposes.  Because these purposes– at least prior to December 9, 2004– included

compensating ATIS, ATIS would have been entitled to some of the money in the segregated

account at some point.  Nowhere in the amended complaint is it alleged that ATIS had to remove

its portion of these fees by any specific time; the forum states only that "ATIS was to be

compensated for its services by deducting [certain amounts] from the revenues it collected on

behalf of IFAST."  (Am. Compl. ¶ 21.)  ATIS's right to that portion of the money in the

segregated account constituting its compensation does not seem to have been time-limited, thus

the post-departure fees would have been allowed to mingle with those funds from the segregated

account properly due to ATIS (if any remained in the account).  Because even the segregated

system that the forum alleges should have been implemented would have permitted co-mingling

of both the post-departure and excess fees with money belonging to ATIS, the forum's argument

that a claim for conversion has been stated based on ATIS's (shirked) duty to segregate the fee

payments is not persuasive.

As for the replevin claim, under Maryland law, replevin allows "[a] person claiming the

right to immediate possession of personal property [to] file an action for possession before

judgment."  1 M.L.E. Actions § 30 (2006) (citing Md. Rule 12-601(a)).  ATIS argues that the

excess and post-departure IRM fees are not forms of personal property which are recoverable

through a replevin action, relying on treatises[19] for the general proposition that "[m]oney is not subject to replevin unless it is marked or designated in some manner so as to become specific, as it regards the power of identification, such as being in a bag or package."  66 Am. Jur. 2d Replevin § 9 (2007).   There is no allegation that either the excess or post-departure fees are "capable of specific identification" for the purposes of replevin, which has held money to fit this definition where "specific bills and coins are identifiable due to serial numbers or special markings, or if bills and coins are located uncommingled within an identifiable container or at a specific place."  *Id.*  Maryland law does seem to require money to be maintained in a specifically identifiable physical form in order to recover it through replevin.  *See*, *e.g.*, *State v. Strickland*, 400 A.2d 451, 452-53, 42 Md. App. 357, 359-60 (Ct. Spec. App. 1979) (noting that the proper action to recover alleged bribe money introduced into evidence during a criminal bribery trial would be a civil action for replevin, provided the "money was still held in specie"[20]) (internal citations omitted).  Thus while an action for replevin might lie if the proverbial pot of gold was stolen from the rainbow's end, it does not lie to recover the value of funds allegedly wrongfully withheld by ATIS.

In addition to bringing claims for conversion and replevin, the corporation also brings a claim for unjust enrichment based on the excess and post-departure fees (count III).   Under Maryland law, an unjust enrichment claim requires three elements: "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit;

---

[19]     Neither party cites any case law on replevin in its briefing.

[20]     "In specie" means the money exists "[i]n the same or like form" as it had upon introduction into evidence.  Black's Law Dictionary (8th ed. 2004).

and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Abt Assocs.*, *Inc. v. JHPIEGO Corp.*, 104 F. Supp. 2d 523, 535 (D. Md. 2000) (internal references omitted).  ATIS correctly points out that the benefit in question– the excess and post-departure fees– was conferred upon ATIS by IRM subscribers, not by the forum.  As discussed with respect to the standing issue, an unincorporated association can own property distinct from the property of its members.  Its property does not become that of its members, nor does its members' individual property automatically belong to it.  An unincorporated association can also take actions separate from its members; that a member of an unincorporated association does something does not necessarily make it the action of the association as a whole.  The forum did not make payments to ATIS; members of the forum sent their IRM fees to ATIS, and ATIS kept them.  It is true that but for the forum's affiliation with IFAST, IRM subscribers would not have been making their payments through ATIS, but the forum's role in facilitating the arrangement does not mean that it conferred the actual benefit in question on ATIS.[21]

---

[21]     The corporation also argues that a quasi-contract (or a contract implied in law) existed between ATIS and the forum; ATIS contends the court should not entertain this theory because it was not mentioned in the amended complaint. This theory was in some sense present in the complaint.  *See Alternatives Unltd.*, *Inc. v. New Baltimore City Bd. School Comm'rs*, 843 A.2d 252, 294-95, 155 Md. App. 415, 487-88 (Ct. Spec. App. 2004) (explaining that a theory of recovery based on quasi-contract is "indistinguishable" from one based on unjust enrichment because the two are "synonymous terms") (internal references omitted).  All the corporation has accomplished by mentioning quasi-contract as well as unjust enrichment, however, is to reiterate its unsuccessful arguments in support of the latter theory.  It has not offered any additional grounds upon which the court could hold in its favor.

The final count (V) is for an accounting[22] of all money and property held by ATIS on behalf of the forum.  ATIS opposes this request, citing as grounds the general view that "[a]n accounting is . . . a remedy, not a separate cause of action, and not available absent some independent cause of action."  1A C.J.S. Accounting § 6 (2007) (internal citation omitted)..  The corporation does not dispute this, but instead argues that "ATIS['s] . . . obligations to IFAST under Counts I through IV [breach of fiduciary duty, conversion, unjust enrichment, and replevin]" entitle the corporation to an accounting.  (*See* Pl.'s Opp'n at 19) (citing *Mass Transit Admin. v. Granite Constr. Co.*, 471 A.2d 1121, 1125, 57 Md. App. 766, 774 (Ct. Spec. App. 1984) as authority for the availability of accounting as an equitable remedy for quasi-contract and unjust enrichment).  Accepting this understanding of the law as correct, count V should be dismissed because it is not cognizable as an independent cause of action, nor available as a remedy because all other claims involving ATIS's alleged duties to the corporation are subject to dismissal.

*Res Judicata and Collateral Estoppel*

Both res judicata and collateral estoppel apply only when there has been a judgment in a prior case.  *See Warner v. German*, 642 A.2d 239, 242, 100 Md. App. 512, 517-18 (Ct. Spec. App. 1994) (defining the doctrine of res judicata as requiring "[a] judgment between the same parties and their privies" in order to bar "any other suit upon the same cause of action") (internal references omitted); *Kent County Bd. Educ. v. Bilbrough*, 525 A.2d 232, 233, 309 Md. 487, 489 (Ct. App. 1987) (requiring same for collateral estoppel).  In light of the disposition of the

---

[22]     An accounting is generally understood as "[a] legal action to compel a defendant to account for and pay over money owed to the plaintiff but held by the defendant".  Black's Law Dictionary 8 (2d pocket ed. 2001).

renewed motion for judgment as a matter of law and the motion for a new trial in the ATIS suit,

it would be premature to proceed as if the entire judgment rendered by the jury were necessarily

final.

**CONCLUSION**

The corporation lacks standing to bring any claims on behalf of the forum.  Furthermore,

even if its suit did not suffer from this fatal flaw, the claims it has brought do not state grounds

for granting relief.  ATIS's motion to dismiss will thus be granted in its entirety.

A separate order follows.


   September 27, 2007                            /s/                 

Date                                    Catherine C. Blake

                                       United States District Judge